Slip Op. 17-30

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ZHEJIANG NATIVE PRODUCE & ANIMAL BY-PRODUCTS IMPORT & EXPORT CORP., *et al.*, | |
| Plaintiffs, | |
| v. | Before: Richard K. Eaton, Judge |
| UNITED STATES, | Court No. 02-00064 |
| Defendant, | **PUBLIC VERSION** |
| and | |
| SIOUX HONEY ASSOCIATION and AMERICAN HONEY PRODUCERS ASSOCIATION, | |
| Defendant-Intervenors. | |

## OPINION

[Plaintiffs' motion for judgment on the agency record is denied; the final affirmative material injury determination of the United States International Trade Commission is sustained.]

Dated: March 22, 2017

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for plaintiffs. With him on the brief were *Bruce M. Mitchell* and *Andrew T. Schutz*.

*Karl S. von Schriltz*, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant. With him on the brief were *Dominic L. Bianchi*, General Counsel, and *Andrea C. Casson*, Assistant General Counsel for Litigation.

*Michael J. Coursey*, Kelley Drye & Warren LLP, of Washington, DC, argued for defendant-intervenors. With him on the brief was *R. Alan Luberda*.

Eaton, Judge: Before the court is the motion for judgment on the agency record of plaintiffs Zhejiang Native Produce & Animal By-Products Import & Export Corp., *et al.*[1] ("plaintiffs"). *See* Pls.' Rule 56.2 Mot. J. Agency R., ECF No. 55 ("Pls.' Br."); Pls.' Reply Br., ECF No. 69 ("Pls.' Reply"). By their motion, plaintiffs challenge the United States International Trade Commission's (the "Commission") final affirmative material injury determination in *Honey From Argentina and China*, USITC Pub. 3470, Invs. Nos. 701-TA-402 and 731-TA-892-893 (Nov. 2001), List 1-75, ECF No. 57, Doc. 1 ("Final Views"), published as *Honey From Argentina and China*, 66 Fed. Reg. 59,026 (Int'l Trade Comm'n Nov. 26, 2001) (final material injury determination) ("Final Determination").[2] Plaintiffs maintain that the Commission unreasonably failed to consider adequately the impact of a suspension agreement when making its cumulation and material injury determinations. *See* Pls.' Br. 22-23; Pls.' Reply 6-9.

In response, the Commission argues that it properly evaluated the impact of the suspension agreement and that its cumulation and material injury determinations were reasonable based on the record evidence. *See* Def.'s Opp'n Pls.' Mot. J. Agency R., ECF No. 61 ("Def.'s Br.") 2-7. Defendant-intervenors Sioux Honey Association and the American Honey Producers

---

[1]     Plaintiffs are Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA) Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

[2]     Shortly after this action was commenced in 2002, it was stayed until December 1, 2014, the date on which the Federal Circuit issued its final mandate regarding USCIT Court No. 02-00057. *See* Order of May 20, 2002, ECF No. 25 (staying case pending final disposition of USCIT Court No. 01-00103); Order of Jan. 30, 2008, ECF No. 27 (staying case pending final disposition in USCIT Court No. 02-00057).

Association join the Commission in urging the court to sustain the Final Determination. *See* Def.-Ints.' Opp'n Pls.' Rule 56.2 Mot. J. Agency R., ECF No. 63.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000)[3] and 19 U.S.C. § 1516a(a)(2)(B)(i). For the reasons set forth below, the court denies plaintiffs' motion and sustains the Final Determination.

## BACKGROUND

In 1994, the United States Department of Commerce ("Commerce") initiated an antidumping investigation of honey from the People's Republic of China ("PRC" or "China") in response to petitions filed by the domestic honey industry. *Honey From the PRC*, 59 Fed. Reg. 54,434 (Dep't Commerce Oct. 31, 1994) (notice of initiation). Subsequently, Commerce preliminarily determined that imports of honey from China were being sold or were likely to be sold at less than fair value ("LTFV") in the United States. *Honey From the PRC*, 60 Fed. Reg. 14,725 (Dep't Commerce Mar. 20, 1995) (notice of prelim. determination).

In 1995, Commerce halted its investigation and entered into a suspension agreement with the Government of China, pursuant to 19 U.S.C. § 1673c(*l*). *Honey From the PRC*, 60 Fed. Reg. 42,521 (Dep't Commerce Aug. 16, 1995) (suspension of inv.) (the "Suspension Agreement"). The Suspension Agreement placed annual quantity and price restraints on imports of honey from China. Specifically, the Suspension Agreement stated:

> For the purpose of encouraging free and fair trade in honey, establishing more normal market relations, and preventing the suppression or undercutting of price

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2000 edition.

> levels of the domestic product, [Commerce] and the Government of the [PRC] enter into this suspension agreement . . . .
>
> Pursuant to this Agreement, the Government of the PRC will restrict the volume of direct or indirect exports to the United States of honey products from all PRC producers/exporters, subject to the terms and provisions set forth below.
>
> On the basis of this Agreement, pursuant to the provisions of [19 U.S.C. § 1673c(*l*)], [Commerce] shall suspend its antidumping investigation with respect to honey produced in the PRC, subject to the terms and provisions set forth below.
>
> . . .
>
> The export limits for subject merchandise in each Relevant Period [*i.e.*, August 1 through July 31] shall be 43,925,000 pounds plus or minus a maximum of six percent per year of quota based upon the U.S. honey market growth in each Relevant Period.
>
> . . .
>
> The reference price equals the product of 92 percent and the weighted-average of the honey unit import values from all other countries for the most recent six months of data available at the time the reference price is calculated.

*Id*. at 42,522-24. The agreement was to be in effect for five years and expired by its terms on August 1, 2000. *Id*. at 42,526.

In September 2000, the domestic honey industry filed new petitions with Commerce and the Commission. *See* Final Determination, 66 Fed. Reg. at 59,026. The petitions alleged, among other things, that dumped honey imports from Argentina and China were causing, or threatening to cause, material injury to an industry in the United States. *See id*. Accordingly, Commerce and the Commission initiated their respective investigations. *Honey From Arg. and the PRC*, 65 Fed. Reg. 65,831 (Dep't Commerce Nov. 2, 2000) (initiation of antidumping duty inv.); *Honey From Arg. and China*, USITC Pub. 3369, Invs. Nos. 701-TA-402 and 731-TA-892-893 (Nov. 2000), List 1-28, ECF No. 57, Doc. 4 ("Preliminary Views").

The Commission's period of investigation covered 1998, 1999, interim 2000, and interim 2001 ("POI"). *See generally* Staff Report accompanying Final Views, List 2-567 ("Staff Report"). The Suspension Agreement was in effect for part of that period. Based on its preliminary investigation, the Commission determined that there was a reasonable indication that the domestic honey industry was materially injured by reason of allegedly dumped honey imports from Argentina and China. *See* Preliminary Views at 3.

Meanwhile, Commerce proceeded with its antidumping investigation and preliminarily determined that Chinese honey imports were being sold, or were likely to be sold, at LTFV in the United States. *Honey From the PRC*, 66 Fed. Reg. 24,101 (Dep't Commerce May 11, 2001) (notice of prelim. LTFV determination); *Am. Prelim. Antidumping Duty Determination of Sales at Less Than Fair Value: Honey From the PRC*, 66 Fed. Reg. 40,191 (Dep't Commerce Aug. 2, 2001). Commerce examined the period of January 1, 2000 to June 30, 2000—a period during which the Suspension Agreement was in effect. *Honey From the PRC*, 66 Fed. Reg. 24,102. In October 2001, Commerce notified the Commission of its final affirmative LTFV determination.[4]

---

[4] Issues surrounding Commerce's investigation and the Suspension Agreement were heavily litigated in Court No. 02-00057. *See Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 27 CIT 1827, Slip Op. 03-151 (Nov. 21, 2003) ("*Zhejiang I*"); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 28 CIT 1427 (2004), *rev'd and remanded*, 432 F.3d 1363 (Fed. Cir. 2005) ("*Zhejiang II*"); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 30 CIT 725, Slip Op. 06-85 (June 6, 2006) (remanding to Commerce for further consideration of its critical circumstances finding in accordance with *Zhejiang II*); Order of Sept. 26, 2007 *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, Court No. 02-00057 (denying plaintiffs' motion for relief from judgment in *Zhejiang I* pursuant to USCIT Rule 60(b)) ("Sept. 26, 2007 Order"); Order of Jan. 11, 2008 *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, Court No. 02-00057 (staying proceedings during appeal of the Sept. 26, 2007 Order); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 339 Fed. Appx. 992 (Fed. Cir. 2009) (dismissing plaintiffs' appeal for lack of jurisdiction because the Sept. 26, 2007 Order was interlocutory); *Zhejiang Native Produce & Animal By-*

(footnote continued)

Case 1:02-cv-00064-RKE   Document 82   Filed 03/30/17   Page 6 of 17

Court No. 02-00064 Page 6

*Honey From the PRC*, 66 Fed. Reg. 50,608 (Dep't Commerce Oct. 4, 2001). Commerce found dumping margins ranging from 25.88 percent to 183.80 percent. *See Honey From the PRC*, 66 Fed. Reg. 63,670, 63,672 (Dep't Commerce Dec. 10, 2001) (notice of amended final determination of sales at LTFV and antidumping duty order).

In turn, the Commission proceeded to make its final material injury determination. When doing so, the Commission assessed the volume and effect of the dumped honey imports from Argentina and China cumulatively, since plaintiffs' petitions regarding honey imports from those countries were filed on the same day. *See* Final Views at 11 (citing 19 U.S.C. § 1677(7)(G)(i)). The Commission determined that there was a sufficient overlap of competition between the subject imports and between the imports and the domestic product to warrant cumulation by considering four factors: (1) fungibility of the imports, (2) the geographic overlap of the markets, (3) the similar channels of distribution, and (4) whether subject imports are simultaneously present in the U.S. market. *Id*. at 11-12. Additionally, the Commission discussed the Suspension Agreement's impact on its decision to cumulate imports:

> The fact that subject imports from China were subject to a suspension agreement for part of the Commission's period examined does not detract from this conclusion. . . . The suspension agreement did not entirely preclude subject imports from China from entering the U.S. market in competition with domestically-produced honey and honey from other imported sources. In addition, the reference price for imports from China under the agreement was tied to that of

---

*Prods. Imp. & Exp. Corp. v. United States*, 34 CIT 283, Slip Op. 10-30 (Mar. 24, 2010) (remanding critical circumstances finding a second time); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 35 CIT __, Slip Op. 11-110 (Sept. 6, 2011) (remanding critical circumstances finding a third time); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 37 CIT __, Slip Op. 13-76 (June 18, 2013) (sustaining Commerce's third remand results); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 580 Fed. Appx. 906 (Mem.) (Fed. Cir. 2014) (affirming USCIT's ruling that Commerce's Final Determination, as supplemented in remand proceedings, was supported by substantial evidence and in accordance with law).

imports from other countries, and Argentina was the largest source of imports during the period.

*Id.* at 15 n.96 (citing Staff Report, tbl. IV-2). Upon completion of its investigation, the Commission issued the Final Determination, concluding, among other things, that the domestic honey industry was materially injured by reason of dumped honey imports from China. *See* Final Determination, 66 Fed. Reg. at 59,026.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ("As required by statute, [the court] will sustain the agency's antidumping determinations unless they are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000))). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## LEGAL FRAMEWORK

The Commission "shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries . . . [where] petitions were filed under [title 19] section 1671a(b) or 1673a(b) . . . on the same day, . . . if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i)(I). This Court

and the Federal Circuit have sustained the test developed by the Commission to determine whether there is a sufficient overlap of competition for the Commission to cumulate subject imports. *See Fundicao Tupy, S.A. v. United States*, 12 CIT 6, 10-11, 678 F. Supp. 898, 902 (1988), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No 103-316, vol. 1, at 848 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4182 ("The new section [1677(7)(G)(i)] will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition, based on consideration of relevant factors." (citing *Fundicao Tupy, S.A.*, 12 CIT 6, 678 F. Supp. 898, *aff'd*, 859 F.2d 915)). The factors provided for in this test include "the fungibility and similar quality of the imports, the similar channels of distribution, the similar time period involved, and the geographic overlap of the markets . . . ." *Fundicao Tupy, S.A.*, 12 CIT at 10-11, 678 F. Supp. at 902. In addition, although these factors detect overlapping competition, courts have recognized that other factors may apply in separate cases, and "no single indicator for weighing competitive overlap is dispositive." *Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357, 1362 (Fed. Cir. 2000) ("[T]he *Fundicao* indicators provide a guiding framework within which the [Commission] may weigh the evidence to inquire whether 'reasonable overlap' of competition exists."). Moreover, "[i]n applying the four factor analysis, the Commission need not find a 'complete overlap' of competition, but merely a 'reasonable overlap' in order to cumulate imports." *Mukand Ltd. v. United States*, 20 CIT 903, 909, 937 F. Supp. 910, 916 (1996) (citing *Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)).

## DISCUSSION

Plaintiffs challenge the reasonableness of the Commission's cumulation and material injury determinations, arguing that the Commission failed to consider adequately the impact of the Suspension Agreement. Plaintiffs maintain that "the terms of the Suspension Agreement were constructed to eliminate unfair imports, squarely addressing the price and volume factors the Commission analyzes for injury . . . ." Pls.' Br. 17; Pls.' Br. 3 ("[T]he terms of the Suspension Agreement were plainly designed to eliminate the injurious effects of Chinese imports."). Plaintiffs also argue that the Suspension Agreement "transform[ed]" unfairly traded Chinese honey imports into fairly traded imports, while the agreement was in effect. Pls.' Br. 22; *see also* Pls.' Reply 2 (referring to the agreement as an "antidumping duty Suspension Agreement"). Based on these ideas, plaintiffs argue that: (1) the Commission erred in cumulating "fairly traded" (*i.e.*, subject to the Suspension Agreement) Chinese honey imports with "unfairly traded" (*i.e.*, not subject to a suspension agreement) Argentine honey imports because it was unreasonable for the Commission to conclude that "fairly traded" Chinese honey imports "competed with" unfairly traded honey from Argentina, Pls.' Br. 17, 18-23; and (2) because Chinese honey imports were "fairly traded" they could not be the cause of material injury to a U.S. industry. Pls.' Br. 23-25. Plaintiffs contend that, "[a]t most, de-cumulated Chinese imports and related relevant economic factors during the [POI] and post-petition period could have only resulted in a threat finding under 19 U.S.C. § 1677(7)(F)." Pls.' Br. 23. Since, in plaintiffs' view, the Commission unreasonably failed to consider adequately the Suspension Agreement in its cumulation and material injury analyses and failed to conduct a threat analysis of non-cumulated Chinese honey imports, plaintiffs ask the court to remand the Final Determination to the Commission for further consideration. Pls.' Br. 23.

A remand is not necessary in this case. The Commission's determination to assess cumulatively the subject imports from China with honey imports from Argentina is in accordance with law and supported by substantial evidence. It is undisputed that petitions alleging LTFV sales of honey from China and Argentina were filed with Commerce and the Commission on the same day. *See* Final Views at 12. Thus, the cumulation statute directs the Commission to assess the volume and effect of imports cumulatively, if the imports compete with each other and the domestic product. 19 U.S.C. § 1677(7)(G)(i)(I). To determine whether there was a reasonable overlap of competition among Chinese and Argentine honey imports and the domestic product, the Commission applied its traditional four factor test. Specifically, the Commission analyzed:

> (1) the degree of fungibility between the subject imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;
>
> (2) the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;
>
> (3) the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and
>
> (4) whether the subject imports are simultaneously present in the market.

Final Views at 11-12 (citation omitted). Based on its analysis of the record evidence pertaining to each of these factors, the Commission concluded that there was a "reasonable overlap of competition between the domestic product and subject imports, and between subject honey imports from Argentina and China." *Id*. at 14.

Regarding fungibility, the Commission reviewed the questionnaire responses of beekeepers, importers, and independent packers pertaining to the interchangeability of domestic and imported honey. As to the interchangeability of domestic and Chinese honey, 84.8 percent of

responding beekeepers indicated that domestic honey was "always" interchangeable with Chinese honey. *Id*. at 13. Seventy-five percent of responding packers and 61.5 percent of responding importers indicated that domestic and Chinese honey were "at least sometimes" interchangeable. *Id*. With respect to the interchangeability of Argentine and Chinese honey, 88.7 percent of responding beekeepers indicated that honey from these two countries was "always" interchangeable. *Id*. Sixty percent of responding packers indicated that Argentine and Chinese imports were "frequently or sometimes" interchangeable, and the same percentage of importers indicated that they were "at least sometimes" interchangeable. *Id*. Based on the record as a whole, the Commission found that there was "general interchangeability" between domestic and imported honey and between Argentine and Chinese honey. *Id*.

Regarding the second factor, the Commission found that there was "a reasonable geographic overlap" between domestic and imported honey and between Argentine and Chinese honey. *Id*. The Commission based this finding on the fact that beekeepers operated in every state in the United States, with a majority of total production coming from five states. Imports were also present in the same areas during the POI. *Id*. Regarding the last two factors, the Commission found that there was "at least a moderate level of overlap in channels of distribution between domestic and imported honey and between [Argentine and Chinese honey]," and that domestic, Argentine, and Chinese honey were simultaneously present in the U.S. market during the POI. *Id*. at 13, 14.

Plaintiffs do not challenge the Commission's application of the traditional four factor test, nor its findings regarding each factor. Rather, they argue that the Commission did not adequately consider the impact of the Suspension Agreement when determining whether Chinese honey imports competed with Argentine honey imports and domestic honey. Pls.' Br. 3 ("[T]he

Commission blindly relied on the four 'competition' factors in its analysis, relegating this very unique circumstance [*i.e.*, that Chinese honey was imported at quantities and prices set by the U.S. government under the Suspension Agreement] to a single footnote."); Pls.' Reply 13.

Contrary to plaintiffs' argument, the Commission reasonably considered the Suspension Agreement in its cumulation analysis. It is evident in the Final Views that the Commission considered whether the Suspension Agreement prevented Chinese honey imports from competing with honey imports from Argentina and domestically produced honey. *See* Final Views at 15 n.96 (addressing the argument of "Chinese Respondents . . . that because the suspension agreement imposed price and quantity restrictions on subject imports from China that it did not impose on subject imports from Argentina, the Chinese product did not compete directly with subject imports from Argentina in the U.S. market."). Indeed, the Commission identified the Suspension Agreement as a "pertinent condition of competition" when it was in effect. *Id*. at 17 ("As we did in the preliminary phase of the investigations, we conclude that the suspension agreement does not preclude us from making either a finding of adverse price effects or an affirmative determination of material injury by reason of subject imports. Nonetheless, we do perceive the suspension agreement to be a pertinent condition of competition during the time it was in effect."). The Commission observed that the agreement "did not entirely preclude subject imports from China from entering the U.S. market in competition with domestically-produced honey and honey from other imported sources." *Id*. at 15 n.96.

The record and the law support the Commission's conclusion that the Suspension Agreement did not preclude competition by Chinese honey with domestic and imported honey. With respect to the quantity of Chinese imports, subject imports from China increased during the POI. Specifically, Chinese honey imports "increased 92.6 percent between 1998 and 2000, from

30.5 million pounds in 1998 to 51.0 million pounds in 1999 and 58.8 million pounds in 2000, and another 49.2 percent between interim 2000 and interim 2001, from 22.4 million pounds to 33.5 million pounds." Def.'s Br. 17 (citing Staff Report, tbls. IV-2, C-1). Consumption of Chinese honey also increased during the POI, while the market share of the domestic industry decreased. Def.'s Br. 17 ("Subject imports from China as a share of apparent U.S. consumption increased from 8.6 percent in 1998 to 14.0 percent in 2000, capturing 5.4 of the 9.8 percentage points of market share lost by the domestic industry during the period." (citing Staff Report, tbl. IV-4)).

Additionally, the Suspension Agreement's price restraints did not prevent Chinese honey from competing with domestic and Argentine honey in the U.S. market. The Suspension Agreement "tied the reference price for subject imports from China to the price of honey imported from all other sources, the largest being Argentina." Def.'s Br. 16 (citing Final Views at 15 n.96). The reference price was "the product of 92 percent and the weighted-average of the honey unit import values from all other countries for the most recent six months of data available at the time the reference price is calculated." Suspension Agreement, 60 Fed. Reg. at 42,524. Accordingly, price restraints on Chinese honey imports fluctuated based on the prices of Argentina's honey imports. Notably, prices of Chinese honey generally remained lower than both domestic and Argentine honey prices while the Suspension Agreement was in effect.[5] Therefore, the Commission considered the Suspension Agreement when making its cumulation

---

[5] Imports of Chinese honey undersold the domestic product "in 39 of 51 quarterly comparisons, or 76.5 percent of the time." Def.'s Br. 18 (citing Staff Report, tbl. V-5). They also undersold Argentine honey imports "in [[   ]] of [[   ]] quarterly comparisons, or [[      ]] percent of the time." Def.'s Br. 18 (Staff Report, tbl. V-1-4).

determination and reasonably concluded that the Suspension Agreement did not preclude competition between domestic and imported honey and Argentine and Chinese honey during the POI. *See* Final Views at 15 n.96 ("The fact that subject imports from China were subject to a suspension agreement for part of the Commission's period examined does not detract from [the decision to cumulate imports].").

Plaintiffs' other arguments against the Commission's cumulation determination are unconvincing. Plaintiffs advance a number of theories including that Chinese honey imports sold under the Suspension Agreement were "fairly traded" and could not have caused injury to a U.S. industry. Pls.' Br. 22. To the extent plaintiffs argue that Chinese imports that were traded in compliance with the Suspension Agreement could not be found to have been sold at LTFV neither the record nor case law supports plaintiffs' contention.[6] Here, Commerce investigated alleged dumping of Chinese honey imports during a period when the Suspension Agreement was in effect and concluded that the imports were being sold at LTFV at margins ranging from 25.88 percent to 183.80 percent. *See Honey From the PRC*, 66 Fed. Reg. at 63,672. This Court held

---

[6] Plaintiffs rely on *USEC, Inc. v. United States*, 25 CIT 49, 132 F. Supp. 2d 1 (2001), which, in part, addressed the proper construction of the pre-Uruguay Round Agreements Act version of the cumulation statute. *See USEC, Inc.*, 25 CIT at 58, 132 F. Supp. 2d at 5. In *USEC*, this Court sustained as reasonable the Commission's interpretation of the phrase "subject to investigation" (which does not appear in 19 U.S.C. § 1677(7)(G)(i)) in declining to cumulate, on one hand, imports that were subject to a suspension agreement at the time the Commission commenced its investigation with, on the other hand, imports that were not subject to a suspension agreement. *Id.*, 25 CIT at 59, 132 F. Supp. 2d at 10 (holding "[t]he ITC may reasonably interpret the 'subject to investigation' provision to mean that imports covered by a suspension agreement in which an investigation is temporarily terminated are not subject to investigation *while under that agreement*." (emphasis added)). *USEC* is inapposite here. Not only is the language of the cumulation statute applied by the Commission in the Final Determination different from that analyzed in *USEC*, but the cases are factually distinct. Unlike in *USEC*, here, neither the Chinese nor Argentine honey imports were subject to a suspension agreement at the time the Commission commenced its investigation.

that Commerce's LTFV determination was supported by substantial evidence and otherwise in accordance with law—a holding that was not appealed. *See Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 27 CIT 1827, Slip Op. 03-151 (Nov. 21, 2003) ("*Zhejiang I*"); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 28 CIT 1427 (2004), *rev'd and remanded*, 432 F.3d 1363 (Fed. Cir. 2005) ("*Zhejiang II*").

Nonetheless, plaintiffs argue that the Federal Circuit's decision in *Zhejiang II* supports the view that since Chinese honey imports were sold in compliance with the pricing and volume terms of the Suspension Agreement, such imports were not dumped and could not cause present material injury. *See* Pls.' Br. 22 ("[T]he [*Zhejiang II* Court] . . . concluded that the [Suspension Agreement] necessarily complied with the criteria set out in 19 U.S.C. § 1673c(b), which authorizes the inclusion of a price restriction in a suspension agreement only to eliminate completely sales at less than fair value." (citing *Zhejiang II*, 432 F.3d at 1365, 1367; internal quotation marks omitted)). In taking this position, however, plaintiffs rely on a reading of *Zhejiang II* that is overbroad.[7] In *Zhejiang II*, the issue on appeal was the lawfulness of Commerce's critical circumstances determination—specifically, whether Commerce could use its standard 25 percent method to impute knowledge of dumping to plaintiffs during a period that

---

[7] This Court has rejected a broad reading of *Zhejiang II*. In Court No. 02-00057, plaintiffs moved under USCIT Rule 60(b) to have the Judgment in *Zhejiang I* vacated, arguing that the Federal Circuit in *Zhejiang II* reversed Commerce's final dumping determination. Denying the plaintiffs' motion, the Court observed that the Court in *Zhejiang II* did "not reach the question of whether plaintiffs could be found to be dumping during the [period of investigation]." Sept. 26, 2007 Order at 9. Rather, in the context of its review of Commerce's critical circumstances determination the *Zhejiang II* Court "held that a suspension agreement designed to prevent the suppression and undercutting of price levels prevented the imputation of knowledge of dumping to the [plaintiffs]. The Court did not . . . equate dumping and price suppression." *Id.*

a suspension agreement was in place. While the *Zhejiang II* Court discussed the Suspension Agreement in this context, it did not hold that imports sold in accordance with the terms of the Suspension Agreement could not be found to have been sold at LTFV—indeed, that issue was not before the Court. *See Zhejiang II*, 432 F.3d at 1366-67.

Moreover, nothing in the Suspension Agreement prevents an affirmative determination of either LTFV sales of Chinese honey imports or material injury to a U.S. industry. *See* Sept. 26, 2007 Order at 12-13 ("Agreements entered into under [19 U.S.C. § 1673c(*l*)] have as their purpose the prevention of undercutting or price suppression – not dumping. Price suppression and sales at less than fair value are just not the same thing."); *Zhejiang I*, 27 CIT at 1835 ("The[] reference prices were not formulated to eliminate completely all sales at less than fair value but rather were designed to meet the statutory criteria for [19 U.S.C. § 1673c(*l*)] agreements: the elimination of price suppression or undercutting." (quoting Issues and Dec. Mem. for the Antidumping Inv. of Honey from the PRC, 66 ITA DOC 50,608 at Comment 1; internal quotation marks omitted)); *see also* Final Views at 17 (concluding that "the suspension agreement does not preclude us from making either a finding of adverse price effects or an affirmative determination of material injury by reason of subject imports"); Preliminary Views at 14 n.80 (citing previous investigations where "[t]he Commission . . . rejected arguments that the existence of . . . [19 U.S.C. § 1673c(*l*)] suspension agreements mandate a conclusion that subject imports are not causing injury").

Because substantial evidence supports the Commission's cumulation determination, and there being no dispute as to any other aspect of the Commission's Final Determination, including its material injury findings under 19 U.S.C. § 1677(7)(C), the Final Determination is sustained.

Case 1:02-cv-00064-RKE   Document 82   Filed 03/30/17   Page 17 of 17

Court No. 02-00064                                                                                          Page 17

*See* 28 U.S.C. § 2639(a)(1) (a decision of the Commission is presumed to be correct, and the "burden of proving otherwise shall rest upon the party challenging such decision").

## CONCLUSION

For the foregoing reasons, the court sustains the Commission's Final Determination as supported by substantial evidence and otherwise in accordance with law. Judgment will be entered accordingly.

/s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated: March 22, 2017
       New York, New York